# In the United States Court of Federal Claims

No. 23-230V
Filed: February 18, 2025
Reissued: March 11, 2025[1]

|  |  |
|---|---|
| JENNIFER BARRIOS and MICHAEL BARRIOS, parents of minor child, B.H.B., | ) ) ) ) |
| *Petitioner*, | ) ) ) |
| v. | ) ) |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | ) ) ) ) |
| *Respondent*. | ) ) |

*David P. Murphy*, David P. Murphy & Associates, P.C., Greenfield, IN, for Petitioners.

*Sarah C. Duncan*, Vaccine/Torts Branch, Civil Division, United States Department of Justice, Washington, D.C., with whom were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, *C. Salvatore D'Alessio*, Director, and *Heather L. Pearlman*, Deputy Director, for Respondent.

**OPINION AND ORDER**

**MEYERS, Judge**.

**I.     Background**

Jennifer and Michael Barrios had their minor child B.H.B. vaccinated with an influenza vaccine in September and October 2020. Within a month of the second vaccination, Mrs. Barrios began seeing B.H.B.'s alertness decreasing. ECF No. 8 ¶ 10. This continued into December 2020. Then, B.H.B. had an episode of extreme fatigue and lethargy, resulting in a trip to an emergency room. *Id.* ¶ 11. After several visits to doctors and specialists into early 2021, including several sleep studies, sleep specialist Dr. Emmanuel Mignot, M.D., Ph.D., concluded that B.H.B.'s symptoms were consistent with type 1 narcolepsy. ECF No. 8 ¶ 23; ECF No. 9-6 at 13–17.

---

[1] The court issued this opinion to the parties on February 18, 2025, and, pursuant to Vaccine Rule 18(b), gave them an opportunity to propose redactions. Because they did not propose any, the court reissues this opinion in its entirety.

Dr. Mignot saw B.H.B. several more times in 2021 and 2022. In February 2022, after additional sleep studies, Dr. Mignot wrote that B.H.B. had "classical narcolepsy type 1." ECF No. 8 ¶ 29. Dr. Mignot opined that B.H.B.'s influenza vaccines caused his narcolepsy and prepared a letter of biological plausibility regarding the influenza vaccine B.H.B. received and narcolepsy. ECF No. 8 ¶¶ 28–29.

In his plausibility letter, Dr. Mignot began by recounting B.H.B.'s symptoms and test results. ECF No. 9-7 at 1. He then recognized that B.H.B.'s young age was unusual but "not exceptional." *Id*. at 2. As to a link to the influenza vaccine, Dr. Mignot pointed to an increased risk of developing narcolepsy after taking Pandemrix, an adjuvanted influenza vaccine. *Id*. He also explained that "DQ0602 positive narcolepsy cases have more T cells reactive to certain epitopes of the 2009-2010 'swine flu' H1N1 HA molecule when compared to matched controls." *Id*. That said, Dr. Mignot recognized that there were no studies showing an increase in narcolepsy following any influenza vaccination other than Pandemrix. But he found it plausible that the vaccine that B.H.B. got, which was not adjuvanted and was not Pandemrix, caused the narcolepsy. *Id*.

Believing that the influenza vaccine caused B.H.B.'s narcolepsy, his parents brought their claim to the Vaccine Injury Compensation Program. During an early conference, the Chief Special Master informed the parties that he "ha[d] on several prior occasions been tasked with determining if the flu vaccine can cause narcolepsy—and have never so found (with my determinations to date being consistently upheld on appeal)." ECF No. 15. In these prior opinions, the Chief Special Master had found evidence of causation lacking:

1. *D'Toile v. Sec'y of Health & Human Servs.*, No. 15-085V, 2016 WL 7664475 (Fed. Cl. Spec. Mstr. Nov. 28, 2016), *mot. for review den'd*, 2017 WL 2729570 (Fed. Cl. Mar. 2, 2017), *aff'd*, 726 F. App'x 809 (Fed. Cir. 2018). The Chief Special Master "considered the scientific reliability and evidentiary persuasiveness of the theory that flu vaccines administered in the U.S. and containing the H1N1 influenza strain can provoke an autoimmune process via molecular mimicry, thereby producing narcolepsy's conclusion that Flumist could not cause narcolepsy." ECF No. 15 at 1. He determined that it could not be shown that the influenza vaccine at issue could cause narcolepsy and noted the distinction between adjuvanted and non-adjuvanted vaccines. ECF No. 15 at 1. His determination "was upheld by this court and affirmed by the Federal Circuit." ECF No. 15 at 1.

2. *McCollum v. Sec'y of Health & Hum. Servs.*, No. 14-790V, 2017 WL 5386613 (Fed. Cl. Spec. Mstr. Sept. 15, 2017), *mot. for review den'd*, 135 Fed. Cl. 735 (2017), *aff'd*, 760 F. App'x 1003 (Fed. Cir. 2019). In *McCollum*, the Chief Special Master concluded that causation failed because "the most reliable literature implicated the inclusion of the adjuvant as the likely causal factor associating H1N1-cotaining vaccines with narcolepsy, and a large-scale epidemiologic study undermined an association involving the unadjuvanted version." ECF No. 15 at 2.

      3. *A.K. v. Sec'y of Health & Hum. Servs.*, No. 17-792V, 2022 WL 2678877 (Fed. Cl. Spec. Mstr. June 17, 2022), *mot. for review den'd*, No. 17-792V, 2024 WL 4524777 (Fed. Cl. Oct. 27, 2022), *aff'd*, 2024 WL 3064398 (Fed. Cir. June 20, 2024).[2] In *A.K.*, the Chief Special Master relied on his prior holdings that the influenza vaccines could not cause narcolepsy but only after explaining that no new literature had been presented or identified that would cause him to reconsider his prior conclusions that the non-adjuvanted influenza vaccines typically administered in the United States do not cause narcolepsy.

Given his prior examination of the science, the Chief Special Master ordered Petitioners to show cause why he should not dismiss this claim based on the same rationale—i.e. that the Petitioner's theory failed to preponderantly establish causation under *Althen*[3] prong one. ECF No. 15. But the Chief Special Master did not decide the causation issue; rather, he invited Petitioners to consult with an expert "to identify and show *new* scientific or medical findings bearing on the subject, and that would justify re-examining whether the inactivated and unadjuvanted version of the flu vaccine could cause narcolepsy." *Id.* at 2. Although the Chief Special Master allowed Petitioners could consult with an expert, he instructed that they should not file an expert report. *Id.*

The Chief Special Master held another conference with the parties in November 2023, in which he went further in explaining what he was looking for in terms of causation evidence. He explained[4] that he understood the studies showing a connection between Pandemrix—the adjuvanted vaccine that has been administered in Europe—and narcolepsy. But, as he addressed in his prior decisions, the influenza vaccines utilized in the United States are non-adjuvanted. As a result, the Chief Special Master advised that:

> You need to show me that either the version that the studies show
> is connected with narcolepsy is administered in the U.S.[,] or that
> the child in question B.H.B. got that one[,] or there needs to [be]
> some new literature or research that says adjuvanted or not, it
> doesn't matter.

ECF No. 20 at 4. The Chief Special Master also recognized that Dr. Mignot opined that it was "plausible" that the non-adjuvanted influenza vaccine that B.H.B. got caused his narcolepsy. On this point, the Chief Special Master emphasized:

> [T]hat in the Vaccine Program the first prong of the *Althen* test,
> whether the vaccine can cause the injury that's alleged, plausibility
> is not the standard, it's preponderance . . . . I need preponderant

---

[2] At the time of the conference in this case, the litigation in A.K. was ongoing and the Federal Circuit had not yet affirmed the Chief Special Master.

[3] As discussed below, *Althen v. Secretary of Health & Human Services*, 418 F.3d 1274 (Fed. Cir. 2005), sets forth the elements a petitioner must establish in a non-table claim.

[4] Although there was not a court reporter, the conference was recorded, and Petitioners transcribed portions of the conference in their response to the show cause order.

> evidence[,] which means more likely than not evidence; it doesn't
> mean certainty, but it means more than plausible.

*Id*. at 4–5.  The Chief Special Master also extended the deadline for Petitioners to respond to his show cause order to allow them more time to consult with an expert.

Petitioners did consult an expert, Dr. Michael Lacey, to review their petition, Dr. Mignot's plausibility letter, and the Chief Special Master's prior cases addressing the connection between the influenza vaccine and narcolepsy. *See id*. at 7.  Petitioners did not submit anything directly from Dr. Lacey, but they did relay his opinions in their response to the show cause order.

According to Dr. Lacey, there are neurological autoimmune phenomena that have been found following acute infections and "post vaccination reactions to H1N1, Shingles, COVID and others." *Id*.  Therefore, Dr. Lacey opines that "to state that something is not possible or attributable simply because a case report can't be found is to draw a conclusion at one's peril." *Id*.

Dr. Lacey next opined about two problems with reliance on the Duffy Study, which had been addressed and found persuasive in *D'Toile*, *McCollum*, and *A.K*.  First, he noted that it was a large survey of data rather than patients, meaning that the Duffy Study does not mean that isolated cases do not exist.  ECF No. 20 at 8.  Second, he explained that, in his view, Duffy performed a "survey" of data rather than a true medical "study." *Id*.  As a "survey," he discounted its usefulness in determining causation. *Id*.

Finally, Dr. Lacey stated that because medical diagnosis requires excluding etiologies that can be eliminated and winnowing down the list to "plausible possibilities," it may be impossible to find the irrefutable cause of a condition. *Id*.  Thus, he criticized the use of the preponderance standard because it requires the reliance on "statistical and legal criteria from a retrospective analysis rather than medical analysis of facts." *Id*.

The Chief Special Master's review of Petitioners' submissions led him to conclude that Petitioners "did not otherwise offer any more recent scientific/medical publications." ECF No. 21 at 3.  Therefore, he dismissed the case based on his prior rulings:

> I have repeatedly determined that the nonadjuvanted form of the
> flu vaccine administered in the U.S. (and regardless of
> administration form) has not been preponderantly established to
> likely cause narcolepsy. *See generally D'Tiole v. Sec'y of Health
> & Hum. Servs.*, No. 15-085V, 2016 WL 7664475 (Fed. Cl. Spec.
> Mstr. Nov. 28, 2016) (involving Flumist/nasal spray vaccine), *mot.
> for review den'd*, 2017 WL 2729570 (Fed. Cl. Mar. 2, 2017), *aff'd*,
> 726 F. App'x 809 (Fed. Cir. 2018); *McCollum v. Sec'y of Health &
> Hum. Servs.*, No. 14-790V, 2017 WL 5386613 (Fed. Cl. Spec.
> Mstr. Sept. 15, 2017) (involving inactivated, intramuscularly-
> administered form of vaccine), *mot. for review den'd*, 135 Fed. Cl.
> 735 (2017), *aff'd*, 760 F. App'x 1003 (Fed. Cir. 2019).  Other
> special masters have reached the same conclusion.  *Dougherty v.*

> *Sec'y of Health & Hum. Servs.*, No. 15-1333V, 2018 WL 3989519 (Fed. Cl. Spec. Mstr. July 5, 2018), *aff'd*, 141 Fed. Cl. 223 (2018). And this summer, the Federal Circuit again concurred with my reasoning, which had resulted in dismissal of a case on the papers rather than after hearing. *Kalajdzic* [*v. Sec'y of Health & Hum. Servs.*], [No. 2023-1321,] 2024 WL 3064398, at *2 [(Fed. Cir. June 20, 2024)].

*Id*. at 5.  Petitioners timely filed a motion for review in which they argue that their inability to file an expert report deprived them of a chance to prove causation.  *See* ECF No. 23 at 3.

## II.   Standard of Review

When reviewing a claim under the Vaccine Act, this court may:

> (A) uphold the findings of fact and conclusions of law of the special master and sustain the special master's decision,
>
> (B) set aside any findings of fact or conclusion of law of the special master found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and issue its own findings of fact and conclusions of law, or
>
> (C) remand the petition to the special master for further action in accordance with the court's direction.

42 U.S.C. § 300aa-12(e)(2).  A key limitation of this statutory regime is that the deference with which the court reviews the Special Masters' decisions.  This court reviews a Special Master's findings of fact deferentially under the "arbitrary and capricious" standard, legal questions under the "not in accordance with law" standard, and discretionary rulings for "abuse of discretion." *Boatmon v. Sec'y of Health & Hum. Servs.*, 941 F.3d 1351, 1358 (Fed. Cir. 2019); *Munn v. Sec'y of Health & Hum. Servs.*, 970 F.2d 863, 870 n.10 (Fed. Cir. 1992).  It is not this court's role "to second guess the Special Master[']s fact-intensive conclusions; the standard of review is uniquely deferential for what is essentially a judicial process." *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993).

"An abuse of discretion may be found when (1) the court's decision is clearly unreasonable, arbitrary, or fanciful; (2) the decision is based on an erroneous conclusion of the law; (3) the court's findings are clearly erroneous; or (4) the record contains no evidence upon which the court rationally could have based its decision." *Simmons v. Sec'y of Health & Hum. Servs.*, 875 F.3d 632, 635 (Fed. Cir. 2017) (quoting *Hendler v. United States*, 985 F.2d 1364, 1380 (Fed. Cir. 1991)); *see also Munn*, 970 F.2d at 870 n.10; *Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 416–17 (Fed. Cir. 1993); *Doe/17 v. Sec'y of Health & Hum. Servs.*, 84 Fed. Cl. 691, 704–05 (2008).  Reversible error is "extremely difficult to demonstrate" when the Special Master has "considered the relevant evidence of record, drawn plausible inferences and articulated a rational basis for the decision." *Hines v. Sec'y of Health & Hum. Servs.*, 940 F.2d 1518, 1528 (Fed. Cir. 1991).

## III.   Discussion

### A.   Legal Standard

Because this is a non-table claim, Petitioners must establish three elements: "(1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of proximate temporal relationship between vaccination and injury." *Althen v. Sec'y of Health and Hum. Servs.*, 418 F.3d 1274, 1278 (Fed. Cir. 2005). The failure to meet just one of the three prongs is sufficient basis for a claim's dismissal. *Dobrydnev v. Sec'y of Health & Hum. Servs.*, 566 F. App'x 976, 980 (Fed. Cir. 2014).

Under *Althen* prong one, Petitioners must provide a "reputable medical theory" demonstrating that the vaccine received *can cause* the type of injury alleged. *Pafford v. Sec'y of Health & Hum. Servs.*, 451 F.3d 1352, 1355–56 (Fed. Cir. 2006) (citations omitted). To satisfy this prong, a petitioner's theory must be based on a "sound and reliable medical or scientific explanation." *Knudsen v. Sec'y of Health & Hum. Servs.*, 35 F.3d 543, 548 (Fed. Cir. 1994). Such a theory must only be "legally probable, not medically or scientifically certain." *Id.* at 549. Petitioners may satisfy the first *Althen* prong without resort to medical literature, epidemiological studies, demonstration of a specific mechanism, or a generally accepted medical theory. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1378–79 (Fed. Cir. 2009) (citing *Capizzano v. Sec'y of Health & Hum. Servs.*, 440 F.3d 1317, 1325–26 (Fed. Cir. 2006)). Special Masters, despite their expertise, are not empowered by statute to conclusively resolve what are essentially thorny scientific and medical questions, and thus scientific evidence offered to establish *Althen* prong one is viewed "not through the lens of the laboratorian, but instead from the vantage point of the Vaccine Act's preponderant evidence standard." *Id.* at 1380.

### B.   The Chief Special Master's consideration of his prior decisions and those of other Special Masters was not improper.

Petitioners' claim challenges the fairness of the process employed by the Chief Special Master. The foundation of that process was his consideration of the prior cases that brought the same causation theory as Petitioners—that the influenza vaccine caused narcolepsy. *Althen* prong one requires Petitioners to put forward "a medical theory causally connecting the vaccination and the injury." *Althen*, 418 F.3d at 1278. The Chief Special Master explained that he had "repeatedly determined that the nonadjuvanted form of the flu vaccine administered in the U.S. (and regardless of administration form) has not been preponderantly established to likely cause narcolepsy." ECF No. 21 at 4–5. Thus, the first question is whether the Chief Special Master's reliance on his prior decisions considering whether the influenza vaccine could be preponderantly shown to cause narcolepsy was an abuse of discretion or contrary to law.

As an initial matter, the Chief Special Master recognized that his prior decisions were "not binding on the outcome" of Petitioners' claim. ECF No. 21 at 5 (citing *Hanlon v. Sec'y of Health & Hum. Servs.*, 40 Fed. Cl. 625, 630 (1998) ("Special masters are neither bound by their own decisions nor by cases from the Court of Federal Claims, except, of course, in the same case on remand.")). But the fact that the Chief Special Master was not bound by his prior decisions does not mean he was required to ignore them—Special Masters are not required to ignore

precedent and relitigate causation theories that have already been litigated repeatedly. The Special Masters have "the unenviable job of sorting through these painful cases and, *based upon their accumulated expertise in the field*, judging the merits of the individual claims." *Deribeaux v. Sec'y of Health & Hum. Servs.*, 717 F.3d 1363, 1366 (Fed. Cir. 2013) (emphasis added) (quoting *Hodges*, 9 F.3d at 961). Indeed, "nothing in prior Vaccine Program case law 'requires the Special Master to ignore probative epidemiological evidence that undermines petitioner's theory.'" *Dougherty v. Sec'y of Health & Hum. Servs.*, 141 Fed. Cl. 223, 230 (2018).

Again, the Chief Special Master considered three prior decisions of his finding that the scientific evidence underlying Petitioners' claim failed to establish causation under *Althen* prong one. He found them "persuasive guidance" that "stand as significant obstacles to the claim that the flu vaccine can cause narcolepsy." ECF No. 21 at 5. Nor was the Chief Special Master alone. He also recognized that another Special Master had also considered and rejected the theory that the nonadjuvanted influenza vaccine typically administered in the United States could cause narcolepsy under *Althen* prong one. *Id.* (citing *Dougherty v. Sec'y of Health & Hum. Servs.*, No. 15-1333V, 2018 WL 3989519 (Fed. Cl. Spec. Mstr. July 5, 2018), *aff'd*, 141 Fed. Cl. 223 (2018)). In *Dougherty*, a Special Master relied upon recent decisions denying claims for lack of causation, and this court affirmed because the Special Master "reasonably explained why Petitioner's arguments in this case failed to establish any persuasive differences from those cases." *Dougherty*, 141 Fed. Cl. at 229–30. Petitioners have not identified any Vaccine Act decisions that have reached a contrary conclusion.

Nor did the Chief Special Master spring his reliance on prior cases on the parties without giving them a clear understanding of how he intended to utilize the prior cases and what evidence Petitioners would need to provide to overcome the prior decisions. In one of his earliest actions in this case, the Chief Special Master issued his show cause order in which he explained that he had considered the causal link between the influenza vaccine and narcolepsy in multiple prior cases and never found causation. ECF No. 15 at 1–2. He did not rule that Petitioners could not establish causation, but that they would need to come forward with "*new* scientific or medical findings bearing on the subject" that would justify reconsidering causation. *Id.* at 2.

Then, during a status conference a few months later, the Chief Special Master explained his prior decisions further. He explained that the science presented to date indicated by preponderant evidence that it was the inclusion of the adjuvant in Pandemrix that created the causal link for narcolepsy, that there was no basis to extend that science to the nonadjuvanted vaccines administered in the United States, and that:

> You need to show me that either the version that the studies show is connected with narcolepsy is administered in the U.S.[,] or that the child in question B.H.B. got that one[,] or there needs to [be] some new literature or research that says adjuvanted or not, it doesn't matter.

ECF No. 20 at 4. And after further explaining the type of evidence that Petitioners would need to bring forward, the Chief Special Master extended their deadline to file their response to the show cause order.

In the end, the Chief Special Master applied the appropriate legal standard and did not abuse his discretion in considering prior decisions regarding causation under *Althen* prong one. Indeed, his reliance on epidemiological evidence about whether nonadjuvanted influenza vaccines can cause narcolepsy is precisely the kind of experience and expertise that Special Masters bring to the table. *Dougherty*, 141 Fed. Cl. at 230; *see also Deribeaux*, 717 F.3d at 1366.

    C.    **The Chief Special Master did not abuse his discretion or err as a matter of law by dismissing this case without allowing Petitioners to file an expert report.**

Petitioners next complain that the Chief Special Master erred by not allowing them to file an expert report. ECF No. 23 at 2–3. When he issued his show cause order, the Chief Special Master explained his prior consideration of Petitioners' theory and that the studies on the subject did not support their theory. And, again, the Chief Special Master did call on Petitioners to identify any new studies or medical findings that would warrant his reconsideration of their causation theory. Recall also that he explained in his order and in the status conference with the parties what type of evidence that he was looking for. He instructed that "Petitioners may consult with an expert, although they should not file an expert report at this time." ECF No. 15 at 2. It is this instruction that Petitioners complain about here, arguing "that they have not had 'due opportunity' to present an expert opinion on the issue of causation as required by *Althen* Prong One." ECF No. 23 at 3.

A Special Master has the discretion to dismiss cases on the written record without allowing the petitioners to submit expert testimony if the Special Master determines "that the record is comprehensive and fully developed before ruling on the record." *See Bello v. Sec'y of Health & Hum. Servs.*, 158 Fed. Cl. 734, 742–44, 748–49 (2022) (internal quotation marks omitted) (quoting *Kreizenbeck v. Sec'y of Health & Hum. Servs.*, 945 F.3d 1362, 1366 (Fed. Cir. 2020)). In *Bello*, the court affirmed the Chief Special Master's dismissal of a case without allowing an expert report because the court found that his "factual findings were reasonable and supported by the record before him," and "[h]is decision not to . . . consider expert testimony represents a reasonable exercise of his discretion . . . and did not deprive Petitioners of a full and fair opportunity to have their claims heard." *Bello*, 158 Fed. Cl. at 749.

The Chief Special Master did not abuse his discretion by deciding this case without hearing expert testimony. He based his decision on the studies of the type of influenza vaccine at issue and provided several opportunities for Petitioners to come forward with any evidence they could that would warrant reconsidering those studies. Indeed, the Chief Special Master gave clear direction on the kind of evidence that he would require to let Petitioners' claim go forward. ECF No. 20 at 4.

Petitioners, however, "offered no new/different scientific or medical findings that would increase the likelihood that Petitioners can meet their burden of establishing that the flu vaccine 'can cause' narcolepsy." ECF No 21 at 5. If the Chief Special Master had simply dismissed the case without any allowance for Petitioners to put forward new evidence, Petitioners could more persuasively contend the record was insufficient. But that was not the case here. Again, the

Chief Special Master explained his familiarity with the studies addressing Petitioners' theory and instructed them to identify any new scientific or medical study or factual distinction that would warrant reconsideration of his prior decision that the nonadjuvanted influenza vaccine could not cause narcolepsy.

Because the Chief Special Master had a sufficient record to determine causation, which was confirmed by the Petitioners' inability to identify new support for their theory, he did not abuse his discretion by deciding this case without hearing expert testimony.

### D. Petitioners fail to establish the Chief Special Master's treatment of their response to the show cause order was an abuse of discretion.

Finally, Petitioners contend they "obeyed the Order of the [Chief Special Master] and submitted only the summary of Dr. Michael Lacey as to the evidence already contained in the [r]ecord." ECF No. 23 at 3. This complaint is difficult to reconcile with the record in this case. As detailed above, the Chief Special Master issued his show cause order in which he identified the specific evidence that would be necessary for this case to go forward—an expert would need "to identify and show *new* scientific or medical findings bearing on the subject, and that would justify re-examining whether the inactivated and unadjuvanted version of the flu vaccine could cause narcolepsy." ECF No. 15 at 2. And during the November 7, 2023 status conference, the Chief Special Master went further:

> You need to show me that either the version that the studies show
> is connected with narcolepsy is administered in the U.S.[,] or that
> the child in question B.H.B. got that one[,] or there needs to [be]
> some new literature or research that says adjuvanted or not, it
> doesn't matter.

ECF No. 20 at 4. There is nothing in either direction that indicates Petitioners would be limited to only what was in the record. It is also notable what Petitioners are not arguing. They do not assert that Dr. Lacey would have presented a report discussing new scientific or medical findings.[5] Rather, they contend that his disagreements with the evidence the Chief Special

---

[5] To the extent that Dr. Lacey's disagreement with the Chief Special Master's prior decisions is based on the Chief Special Master requiring petitioners to establish causation by the preponderance of the evidence rather than plausibility, ECF No. 20 at 8–9, that contention is misplaced. First, the evidentiary standard for claims under the Vaccine Program presents a question of law on which expert testimony is not proper. Second, and more importantly, the Federal Circuit has consistently and uniformly rejected the argument that plausibility is sufficient and held that petitioners must establish causation by a preponderance of the evidence. *See LaLonde v. Sec'y of Health & Hum. Servs.*, 746 F.3d 1334, 1339 (Fed. Cir. 2014) ("[S]imply identifying a 'plausible' theory of causation is insufficient for a petitioner to meet [his] burden of proof. Instead, the statutory standard of preponderance of the evidence requires a petitioner to demonstrate that the vaccine more likely than not caused the condition alleged." (internal citation omitted) ((citing *Moberly v. Sec'y of Health & Hum. Servs.*, 592 F.3d 1315, 1322 (Fed. Cir. 2010))).

Master relied upon in his prior decisions justify reconsidering the prior decisions.  ECF No. 20 at 9.  The Chief Special Master did not abuse his discretion rejecting this contention.

### IV.     Conclusion

Because the Chief Special Master applied the proper legal standard and reasonably relied on his prior experience with Petitioners' causation theory, the court denies the Petitioners' motion for review, ECF No. 22, and sustains the Chief Special Master's decision.

The Clerk's Office is directed to enter judgement accordingly.

It is so ORDERED.

s/ Edward H. Meyers<br>
Edward H. Meyers<br>
Judge